Rockingham, Nov. 2, 1943. } No. 3427.

WALTER S. MANTER *v.* BOSTON FIRE INSURANCE COMPANY.

SAME *v.* LIVERPOOL & LONDON & GLOBE INSURANCE COMPANY.

22

*McLane, Davis & Carleton* and *Robert P. Bingham* (*Mr. Bingham* orally), for the plaintiff.

*Thorp & Branch* (*Mr. Branch* orally), for the defendants.

PAGE, J.    There seems to be no doubt that the fire originated in the kitchen chimney.    From the kitchen a passage ran to a dance hall in the rear.    The kitchen chimney projected into this passage, and there was a clean-out door opening into the passage from the chimney.

Mrs. Whitehouse, who was with Mrs. Gove at the time of the fire, testified that when it was discovered that the chimney was afire, they went out into the passage and found that the clean-out door was open.    Mrs. Whitehouse described the fire as presenting no danger, but said that Mrs. Gove kindled a fire in the passage near the chimney.    Mrs. Gove, on the other hand, charged Mrs. Whitehouse with kindling it.

As a result of Mrs. Whitehouse's talk, Mrs. Gove was arrested and examined.    When Mrs. Gove realized who had caused her arrest, she sent for Lt. Percy of the State Police and told him that she was now ready to tell the whole truth, which she had not done when he had interviewed her at an earlier date.

Consequently Lt. Percy and David Rubino, who represented the defendants, visited Mrs. Gove at the Manchester jail.    A stenographer recorded the interview, a transcript of which was introduced and given to the jury without objection by the plaintiff's counsel.

It appears from the transcript that, having been warned who were present and told that they made neither threats nor promises, but that what she said could be used against her, Mrs. Gove expressed readiness to tell what happened.    Without any prompting, she then told this story: "We heard this roar same as in the chimney and the three of us [Mrs. Gove, Mrs. Whitehouse and a young woman named Pauline] started toward the hallway where the chimney was. The little door was opened [clean-out door at base of chimney] and it was roaring to beat the band and I said '. . . I can put that out, get me the shovel' and Mrs. Whitehouse pushed me and she said 'get . . . into the other room' and I pushed Pauline ahead of me

and we went [through the kitchen] into the dining room . . . she [Mrs. Whitehouse] grabbed all the papers that you do up bread with [wax papers] and newspapers that were laying on the table and I see her take them and put them down near the chimney where the fire door was open, then she comes back in and she says 'sit down' and then she goes to the kitchen and she says '. . . grab everything you can get, grab the baby and start and run the whole business is going;' . . . and she was the last one in the kitchen and the first one to see the fire."

Without any leading, Mrs. Gove further said that beside the chimney was a wood box containing dry shingles and paper. "The clean out door was left open when we went into the dining room. . . . It was all ablaze, falling right down to the floor. . . . It [the clean-out door] was open when we got out there." Mrs. Gove further volunteered that when they had looked at the fire in the chimney, Mrs. Whitehouse said "get . . . into the other room . . . we've talked this over a lot." Mrs. Gove declared that Mrs. Whitehouse had more than once advocated burning the house during a period of some nine months prior to the fire, had suggested two members of her family as capable of doing it, and declared that she herself would set the fire for $200. After the fire, said Mrs. Gove, Mrs. Whitehouse demanded $200 as the price of silence, and Mrs. Gove stated that she did give her some small amounts.

The plaintiff says that this voluntary statement may be disbelieved because it was made while Mrs. Gove was in a resentful frame of mind and wished to throw the burden of fault principally on Mrs. Whitehouse. But the statement is more than a charge against Mrs. Whitehouse; it is also a charge against Mrs. Gove herself, and to that extent it is completely to be credited. If upon the statement there could be any doubt as to whether Mrs. Gove connived at the setting of the fire, or whether in her proofs of loss she attempted to defraud the defendants, it is not open to doubt that on her own statement Mrs. Gove could have put out the small soot fire in the chimney, or that she could have closed the clean-out door and kept the fire inside the chimney. Nor can there be any doubt, according to her own voluntary admission, that she sat or stood by, and did nothing while fuel was added to the flame with the declared intention of destroying the house. Mrs. Gove's statement was entirely voluntary and clear; it concerned facts wholly within her own observation; and her account of what she did and did not do, contrary to her own interest, is not to be disbelieved. It is clear that the policies, as between her

and the defendants, were avoided by breach of the condition, "If the insured property shall be exposed to loss or damage by fire, the insured shall make all reasonable exertions to save and protect the same." All this happened while Mrs. Gove was the insured. When, five days later, she assigned the policies to Manter, it is beyond question by reasonable men that the defendants had a good defense against her.

The plaintiff in this regard had the burden of proof, and in the face of Mrs. Gove's statement it was impossible for him to sustain it. He suggests that this case is to be distinguished from *Lamb* v. *Company*, 88 N. H. 306. The asserted ground for distinction is that it does not clearly appear that this fire was incendiary, and that "there is substantial and creditable evidence that the plaintiff's assignor did not set or connive in the setting of the fire, and that she did all that a person with her physical handicaps at the time could reasonably be expected to do to put out the fire." Omitting the question whether it was Mrs. Gove or Mrs. Whitehouse who added exterior fuel to the flame in the chimney, Mrs. Gove's own statement that she could have put out the chimney fire with a shovel, but was dissuaded by Mrs. Whitehouse, leaves her without excuse. If she was pushed by Mrs. Whitehouse, as she said, her own story shows that she had sufficient physical powers while herself walking through the kitchen, to push Pauline (a young adult mother) into the dining room, and later to remove personal property. As she voluntarily stated, "I grabbed Mr. Manter's clothes and bedding, two chairs, sewing machine and the rugs." That indicates no physical inability to deal with the extinction of the chimney fire that she said she could put out, but rather acquiescence in what she quoted Mrs. Whitehouse as saying — "we've talked this over a lot . . . this is just what we wanted, let it [the fire] go." No reasonable man could find that Mrs. Gove failed by inaction to avoid the policies.

The acceptance by the insurers of the post-fire assignments of the policies to Manter might waive the stipulation against the sale of the property without the written assent of the insurers, but could not waive the stipulation that she as the insured must make all reasonable exertions to save and protect the property when threatened by fire, on pain of avoidance of the policies. *Jean* v. *Association*, 92 N. H. 514, and cases cited.

The plaintiff suggests the principle that he is not subject to defenses not existing at the time of the assignment, and asserts that as a purchaser for value he has rights superior to Mrs. Gove's. The

assignments were dated five days after the acts of Mrs. Gove had entitled the defendants to avoid the policies. The mere circumstance that Mrs. Gove did not disclose until later the facts on which the defense rested is immaterial, since the facts and the rights of defense are to be related to June 9, 1939, at least if Manter was put upon inquiry. *Rowe* v. *Langley*, 49 N. H. 395, 396. Manter testified that he had always thought there was something suspicious about the fire, so he was placed on inquiry. At the moment of the fire Manter had an insurable interest in the property, but no interest in the insurance policies. He acquired his later claim to them, as far as appears, for no fresh consideration and under circumstances that rendered him suspicious about the fire. It could not be said that he took the policies equitably freed from the defense that existed at the time of the loss. The motions for directed verdicts should have been granted. Other questions raised need not be considered.

*Judgments for the defendants.*

BRANCH, J., did not sit: the others concurred.

ON MOTION FOR REHEARING. After the foregoing opinion was filed, the plaintiff moved for a rehearing and advanced several reasons therefor.

*McLane, Davis & Carleton* and *Robert P. Bingham,* by brief, for the motion.

PAGE, J. One contention advanced for the rehearing relates to the burden of proof concerning performance of the stipulations in the policies that the insured must make all reasonable exertions to save and protect the property when threatened by fire, on pain of voidance of the policies. This is now, for the first time, represented to be a condition subsequent, the breach of which can be established only if the defendants assume the burden of proof. The plaintiff, on this theory, urges that Mrs. Gove's statement could be disbelieved by the jury, leaving no evidence that the policies were avoided, so that the defendants could not sustain the burden of proof. The only authority cited by the plaintiff to sustain his point of law is 3 Williston, Contracts (Rev. *ed.*), s. 667a, to the effect that such a stipulation

as we are considering is a condition subsequent for purposes of pleading and proof, though for every other purpose it is a condition precedent. Thus, fraud must be pleaded by the defendants and the burden of proving it is on them. That appears to be the law in many southern and western states whose treatment of insurance policies differs markedly from ours, but it is not the law here. The burden was not on the defendants to establish breach of the conditions. After evidence was introduced tending to show the breach, the burden of persuasion was on the plaintiff to show that there was no breach. *Trepanier* v. *Company*, 88 N. H. 118, 121; *Lamb* v. *Company*, 88 N. H. 306, 307; *Malloy* v. *Head*, 90 N. H. 58, 60.

The statement in the original opinion that Mrs. Gove's admission could not be disbelieved is not to be understood as meaning that a post-assignment declaration by an assignor is binding as a matter of law on the assignee, or that it is admissible in the face of objection, even though it is relevant (as Mrs. Gove's was) to material facts. 4 Wig. Ev. (3d *ed.*), ss. 1085, 1059. But Mrs. Gove's declaration went to the jury without objection. Except for its denial of arson by her, it was not self-serving, but the opposite. The part upon which the original opinion relied was not self-serving, and it had internal credibility. Moreover, it was sustained in great measure by Mrs. Whitehouse's testimony. The only substantial conflict between the stories of the two women related to whether the one or the other added fuel to the chimney fire. They agreed perfectly that the fire door was open and that the fire in the chimney was not serious. Mrs. Gove's failure to do anything to put out the fire or close the fire door is undisputed. On all of the evidence, the jury must find either (1) that Mrs. Gove actively caused the fire to communicate to the building, or (2) that she did nothing when she saw Mrs. Whitehouse do so, or (3) at least that she failed to put out the chimney fire when she could, or even to close the fire door in order to avoid the spread of the fire. The plaintiff now asserts that the jury could believe that the fire in the chimney was excessively hot and that it communicated to the building without the active or passive intervention of anybody. To do that, they must discredit all the testimony of the only eyewitnesses, and substitute wishful thinking and pure guess for evidence. The plaintiff cannot escape his dilemma in that way.

Finally, the plaintiff contends now, for the first time, that the defendants admitted liability because their adjuster agreed with Mrs. Gove and Manter as to the amount of the loss, and drew their checks

for the amount agreed upon. If the adjuster, as seems possible, had authority to admit the amount of the damages, it does not appear that any agents of the defendants who drew the checks, or who ordered them drawn, had at the time any notice of the defense based on Mrs. Gove's later admission, or had any authority whatever to admit liability. Under the circumstances, the jury would not be warranted in finding that there was an admission of liability.

*Motion denied.*

BRANCH, J., did not sit: the others concurred.